1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT
                         WESTERN DISTRICT OF WASHINGTON
9                                   AT TACOMA

10   DENISE R. FRASER,                        CASE NO. 11-5273 RJB

11                  Plaintiff,                ORDER ON DEFENDANTS'
                                              MOTION FOR SUMMARY
12          v.                                JUDGMENT

13   WASHINGTON STATE DEPARTMENT
     OF CORRECTIONS; GREGORY A.
14   BROWN; and THOMAS LOWRY,

15                  Defendants.

16

17          This matter comes before the Court on Defendants' Motion for Summary Judgment (Dkt.

18   26), motion to strike (Dkt. 46) and Motion to Enlarge Time to File Defendants' Summary

19   Judgment Reply (Dkt. 44).  The Court has considered the pleadings filed in support of and in

20   opposition to the motions and the file herein.

21          In this case, Plaintiff asserts that she was subjected to a hostile work environment based

22   on the unwanted attentions of another corrections officer.  Plaintiff alleges that she was fired

23   because she spurned his advances.  Defendants assert that she violated several Department of

24   Corrections ("DOC") policies and so, for safety reasons, they felt they had to let her go from her

probationary position. Plaintiff's federal claim for hostile work environment should be dismissed because Plaintiff failed show that her alleged harasser's behavior could be imputed to the DOC. The Court will consider declining jurisdiction on Plaintiff's remaining state law claims, and this case may be remanded.

## I.   FACTS AND PROCEDURAL HISTORY

### A.  RELEVANT FACTS

1.  Plaintiff's Employment at the Cedar Creek Corrections Center

Plaintiff began working for the DOC at the Cedar Creek Corrections Center ("CCCC") as an intermittent (nonpermanent/temporary) corrections and custody officer on November 12, 2008. Dkt. 38-1, at 1. She received initial training, "CORE training," which was a 232 hour (5 weeks, 4 days) course "focused on core security issues, to include security risks associated with the introduction of contraband, guarding against inmate manipulation, and maintaining professional relationships with inmates." Dkt. 38, at 2. Plaintiff acknowledges that during her CORE training, she received a copy of DOC's sexual harassment policies and received training regarding sexual harassment. Dkt. 27-12, at 5-9. As a result, it was her understanding that at DOC, sexual harassment was "just not tolerated" and if you were a victim of sexual harassment or observed it, you could report it "up the chain of command." Dkt. 27-12, at 8-9. Plaintiff states through CORE training, she also became aware that if a correctional officer had a personal or family relationship with an offender, the officer had to fill out an offender contact form. Dkt. 27-12, at 9. Officers were also to report contact with offender's family members. Dkt. 29, at 2.

At the recommendation of Captain Michael Obenland, as well as Charlie Washburn, then the Correctional Program Manager, CCCC Superintendent Hisami Yoshida hired Plaintiff as one of two new permanent Corrections Officers 1, starting July 1, 2009. Dkt. 38, at 3. As a

Corrections Officer 1, Plaintiff was to complete a one-year period of probation and the on-the-job training requirements of CCCC's "COACH" program.  Dkt. 38, at 3.

The COACH program was a "formal on-the-job training program where new staff are given task maps and other staff assist and observe them carrying out those tasks."  Dkt. 27-11, at 5.  Supervising staff give the new correctional officers feedback and then sign off when the task is complete.  Dkt. 27-11, at 5-6.  If Plaintiff had finished the COACH program and her one year period of probation, she would then have been eligible for a promotion to Corrections Officer 2.  Dkt. 38, at 3.  At the time of her separation, Plaintiff had positive observation/feedback reports on 49 of the 52 COACH tasks.  Dkt. 42, at 4.

Some of Plaintiff's positive feedback reports were completed by Defendant Thomas Lowery, a senior Corrections Officer 2 at CCCC.  Dkt. 27-12, at 21-22.  Although fairly limited, they had a positive working relationship.  Dkt. 27-12, at 22.  Plaintiff does recall an incident where CO Lowery counseled her about being alone with an offender, and later discouraged her from "horsing around" with some of the other correctional officers.  Dkt. 27-12, at 22-24.  CO Lowery was unaware that Defendant CO Greg A. Brown was romantically interested in Plaintiff during the time she worked at CCCC.  Dkt. 27-5, at 39-41.

2. <u>Plaintiff's Interactions with Co-Worker Defendant CO Gregory Brown</u>

Plaintiff states that at the time she began working at CCCC, another coworker who was a friend, told her that Defendant CO Gregory A. Brown "liked" her.  Dkt. 27-12, at 25.  Plaintiff told her friend that she was not interested in a relationship.  Dkt. 27-12, at 25.  CO Brown called Plaintiff at work on the facility phones and on her cell phone.  Dkt. 27-12, at 32.  He sent her text messages.  Dkt. 27-12, at 32.  She called him on his cell phone three or four times and responded to his text messages.  Dkt. 27-12, at 32.  According to her, CO Brown did not say anything

inappropriate in their phone calls – most of the conversations "just pertained to work." Dkt. 27-12, at 37-38. He did not text her anything inappropriate, but she thought it was "weird that he sent [her] pictures of his kids." Dkt. 27-12, at 38.

In her Complaint, Plaintiff alleges that CO Brown would touch her bottom during shift changes. Dkt. 1. In her Declaration, Plaintiff states that "on several occasions, Brown made sexual comments and gestures toward me, including sexual inuendos and numerous inappropriate touching." Dkt. 42, at 2. When questioned at her deposition, Plaintiff testified that he was "very persistent" in indicating he wanted a relationship, even though she told him repeatedly that she was not interested. Dkt. 27-12, at 38. In regard to touching, Plaintiff testified that:

> During, you know, exchanging of chits and cuffs, you know, there would be a little bit, you know, just when someone's touching – touching your hand or instead of just grabbing the cuffs or the keys, just the – comments that he would say. He always – let it be known that – he liked me, that I smelled good, you know, that he liked my hair, and that he'd like to be in a relationship.

Dkt. 27-12, at 38. Plaintiff testified that when she would tell him she did not want to get in a relationship at that time, he would say he would give her "all the time [she] needed." Dkt. 43-6, at 6.

There are two units at the CCCC, the Olympic Unit and the Cascade Unit. Dkt. 32, at 3. Plaintiff states that sometimes when she was in a little office in the Olympic Unit, CO Brown would come in, close the door, and talk with her about having a relationship. Dkt. 43-6, at 18. She states that no other officer would close the door when they were in the office with her. Dkt. 43-6, at 18.

Plaintiff states that she attempted to "brush off" his comments and gestures because she believed that she needed his approval due to "his close relationship and 'considerable influence'"

with Lt. Jack Dolman.  Dkt. 42, at 2.  Lt. Dolman was head of the prison's Security Threat Team,

and because CO Brown was on the team, they had done investigations together.  Dkt. 34, at 2.

At her deposition, Plaintiff testified that:

> Q. Did Correctional Officer Brown ever indicate that he would put in a good word
> for you?
> A. Yes.
> Q. What did he say?
> A. He said he'd put in a good word for me.
> Q. With whom?
> A. He didn't say.
> Q. Did any other correctional officer say they would put in a good word for you?
> A. No.
> Q. Did you have any conversation with Greg Brown at that time regarding what
> he meant by that or who he would put in a good word to?  He was a fellow
> correctional officer like you, correct?
> A. Correct.
> Q. Did you ask him to explain?
> A. No.
> Q. Did Mr. Brown ever fill out any of your COACH feedback reports?
> A. Not that I know of.

Dkt. 43-6, at 5.

Plaintiff acknowledges that she and CO Brown had two social contacts outside of work.  Dkt.

27-12, at 26.  She states that she and CO Brown often worked together and talked about their

respective children.  Dkt. 27-12, at 27.  She told him she liked to ride four-wheelers with her

children.  Dkt. 27-12, at 27.  According to Plaintiff, one day in the summer of 2009, CO Brown

contacted her and told her that he knew of some trails behind the facility that would be "good for

riding the quads."  Dkt. 27-12, at 27.  Plaintiff agreed to go with him and drove to a store to meet

him after work.  Dkt. 27-12, at 27.  Plaintiff then got in his car to drive up to the trials.  Dkt. 27-

12, at 27-28.  They got out of the vehicle and hiked.  Dkt. 27-12, at 29.  While on this hike, she

states that they discussed their children, being single parents, and his divorce.  Dkt. 27-12 at 30.

Plaintiff states that she was walking ahead of him and, at one point, he said that she "looked

good in [her] jeans." Dkt. 27-12, at 30. Plaintiff slowed down to walk beside or behind him. Dkt. 27-12, at 30-31. She states that at the end of the trail, he "asked if he could give [her] a kiss, and [she] said no." Dkt. 27-12, at 31. Their outing then ended. Dkt. 27-12, at 31.

The second meeting outside of work between Plaintiff and CO Brown also occurred in the summer of 2009. Dkt. 27-12, at 34. He contacted her at home one morning when she was off work. Dkt. 27-12, at 34. He asked if he could stop by her home. Dkt. 27-12, at 34. Plaintiff agreed and gave him directions to the house. Dkt. 27-12, at 34-35. When he arrived, he gave her a rose, and because her father was home, they went for a walk. Dkt. 27-12, at 35-37. She states that he did not say anything inappropriate on that occasion. Dkt. 27-12, at 37.

Plaintiff states in that after his visit to her home, CO Brown seemed to finally understand and accept that she did not want a relationship with him. Dkt. 42, at 3. Plaintiff notes that after she made it clear that she did not want a "romantic relationship with him, his demeanor toward [her] changed." Dkt. 42, at 3. She states that he became "very distant and childish." Dkt. 42, at 3.

3. <u>Plaintiff's Connection to Certain Offenders at the CCCC</u>

Fairly soon after her promotion to CO 1, around late February of 2009, Plaintiff filled out a "Report of Contact/Relationship with an Offender" form. Dkt. 29-1, at 1. She indicated that offender Edward Brown, an inmate a CCCC, was a "distant family member," later clarified in an interview with Lieutenant Charlotte Headley as "uncle to her children." Dkt. 29-1, at 1. She submitted the form, and when asked about the nature of the relationship, Plaintiff indicated that offender Brown had not had regular contact with her for many years. Dkt. 29-1, at 1. As a result of her conversation with Plaintiff about the form, her supervisor, Lt. Headley, marked on the form that the contact was not significant and noted that Plaintiff should report all contact with

this offender.  Dkt. 29-1, at 1 and 27-7, at 3-7.

Annette Brown is offender Brown's mother, and is Plaintiff's children's paternal grandmother.  Dkt. 27-12, at 13.  Offender Johnny Cash, also a CCCC inmate at the time, is Offender Edward Brown's stepfather, as he was dating, or married to, Annette Brown.  Dkt. 27-12, at 13.

There is no "Report of Contact/Relationship with an Offender" form in the record regarding Plaintiff and offender Cash or Annette Brown.  Plaintiff testified that she filled out an offender contact form regarding offender Cash on a computer and then "put it in the sergeant's box."  Dkt. 43-6, at 3.  She states that no one followed up with her about it and she did not raise the issue again.  Dkt. 43-6, at 3.

Lt. Headley denies any discussion with Plaintiff about Plaintiff's family relationship/personal connection to offender Johnny Cash or Annette Brown.  Dkt. 27-7, at 8.  Lt. Headley states that Plaintiff did not mention that she had regular contact with Annette Brown.  Dkt. 29, at 3.

4.  Plaintiff is Investigated in July of 2009

Investigator Jerry Shumaker opened an investigation of Plaintiff in late July of 2009 after receiving information from a confidential informant that Plaintiff had given offender Brown and offender Cash marijuana on two separate occasions.  Dkt. 30, at 1-2.  Lt. Jack Dolman, who was the initial contact for the confidential informant, was present for the interview of the informant and part of the investigation.  Dkt. 27-8, at 3-4.

As part of his inquiry, Investigator Shumaker also reviewed phone calls of offenders Brown and Cash as part of his investigation.  Dkt. 30, at 2.  He states that "[t]he monitoring of this telephone activity convinced [him] that a close personal relationship existed between

1  offender Brown, offender Cash, Annette Brown, and CO Denise Fraser." Dkt. 30, at 2.

2  In his report to Superintendent Yoshida, Investigator Shumaker stated that offender

3  Brown had regular phone contact with his mother, Annette Brown. Dkt. 30-1, at 2. He states

4  that offender Cash also had regular phone contact with Annette Brown, his wife/girlfriend. Dkt.

5  30-1, at 2. In his report, Investigator Shumaker also relays various conversations between

6  offender Brown, offender Cash and Annette Brown, and then states that based on the content of

7  these conversation he felt that Plaintiff "performed message deliveries" for offender Brown and

8  offender Cash "to and from" Annette Brown. Dkt. 30-1, at 7. Further, Investigator Shumaker

9  had the impression that Plaintiff had a "far more significant relationship" with offenders Brown

10  and Cash than she reported. Dkt. 30-1, at 7. He also concluded that the telephone monitoring

11  "did not support or refute the claims of the [confidential informant] regarding the traffic of

12  marijuana into CCCC" by Plaintiff. Dkt. 30-1, at 7.

13  Investigator Shumaker told Superintendent Yoshida that Plaintiff should be separated

14  from her probationary position because: 1) she failed to report the degree of significance of her

15  relationship with offender Brown, 2) failed to report that she had any relationship with offender

16  Cash and contact with Annette Brown, and 3) "appeared" to be delivering messages from

17  Annette Brown, to and from offenders Brown and Cash. Dkt. 30, at 3. He states he felt that

18  Plaintiff was a "continuing threat to public, staff, and offender safety as well as the overall

19  security of the facility." Dkt. 30, at 3.

20  Superintendent Yoshida declined to adopt the recommendation of Investigator Shumaker

21  at that time, because she felt that they "lack[ed] direct evidence of misconduct" by Plaintiff.

22  Dkt. 38, at 3. She remained concerned about Plaintiff's relationships with these offenders and

23  the possible introduction of contraband, so asked Lt. Dolman to monitor the situation. Dkt. 38,

24

at 3.

5.  <u>Plaintiff Enters the Secured Housing Unit in September of 2009</u>

On September 10, 2009, Plaintiff was working as a response and movement officer ("R&M"). Dkt. 27-12, at 43. An R&M officer does not usually deliver mail. Dkt. 27-11, at 36. However, Plaintiff's supervisors made it clear though, "that instead of just standing around, if we were not doing movement, if we are not standing main line . . . we are to help the unit officers with – with whatever duties they might need assistance in." Dkt. 27-12, at 43. On that day, on her way to have her break, she passed through the Olympic Unit to grab an energy drink. Dkt. 27-12, at 43. She states that she saw CO Brown doing the mail by himself, when typically two officers do it. Dkt. 27-12, at 43. Plaintiff states that she sat down next to him and helped pass out the mail. Dkt. 27-12, at 44. She states that in the course of passing out the mail, she came across mail for offender Brown, and set it aside because she was aware that he was in the Secure Housing Unit ("SHU"). Dkt. 27-12, at 44. The SHU is "a separately locked, restricted area" within the Cascade unit. Dkt. 33, at 2. Offenders are housed there for security reasons, including investigation for disciplinary infractions. Dkt. 33, at 2.

In any event, when Plaintiff and CO Brown were finished delivering the mail in the Olympic Unit, she immediately left to go to the SHU to deliver offender Brown's mail. Dkt. 27-12, at 44. She states that she did not tell anyone in the Olympic Unit that she was taking mail for offender Brown. Dkt. 27-12, at 46. She states that she did not stay in the Olympic Unit for any period of time after passing out the mail because she was trying to get in a "quick smoke break" before returning to her other duties. Dkt. 27-12, at 46.

Plaintiff entered the Cascade Unit and went to retrieve the SHU's key from the lockbox. Dkt. 27-12, at 48. At that point, Plaintiff was stopped by CO Lowery, who was on duty in the

SHU. Dkt. 27-5, at 4. CO Lowery asked her what was going on because she had what appeared to be mail to be distributed. Dkt. 27-5, at 9. CO Lowery states that the unit officers are primarily responsible for handling the mail that goes into the SHU for security reasons. Dkt. 27-5, at 9. CO Lowery testified that typically, if there is mail for someone in the SHU, the mail comes to the unit already sorted, and the unit officer checks the status board to see if there is a "no communication" restriction and then can either further review it the mail for contraband. Dkt. 27-5, at 10. The unit officers then give out the mail during mail call. Dkt. 27-5, at 10. CO Lowry testified that anything that goes into the SHU is supposed to be screened by the unit officers, who have a working knowledge of what is going on in that unit. Dkt. 27-5, at 11. In any event, CO Lowery told Plaintiff that offender Brown had "restrictions." Dkt. 27-12, at 48. According to Plaintiff, they stood together and inspected the three cards for offender Brown. Dkt. 27-12, at 49. CO Lowery states that he "had some level of suspicion" because the cards were not typical – there was no postage on them, no addresses, or offender's living unit. Dkt. 27-5, at 15. Plaintiff realized there were no addresses on any of the cards after CO Lowery pointed it out. Dkt. 27-12, at 49. Plaintiff states that she thought that the cards "came from the mail room where they had apparently been inside a larger postage paid manila envelope." Dkt. 42, at 5.

According to Plaintiff, at no time did CO Lowery tell her offender Brown "can't have those, let's talk to the sergeant." Dkt. 27-12, at 50. She was in a hurry to get to her break. Dkt. 27-12, at 52. Plaintiff testified that she doesn't remember whether CO Lowery told her the cards were fine, or whether he just nodded, but he put the cards in the envelopes and gave them to her or set them on the counter. Dkt. 27-12, at 53. CO Lowery testified that Plaintiff appeared "upset." Dkt. 27-5, at 22. (CO Lowery states he set the cards on the counter, said "hold up," and

1  left to contact the supervising sergeant.  Dkt. 27-5, at 18-19.)  Plaintiff then took the cards and

2  got the key to the secured housing unit from the lock box.  Dkt. 27-12, at 50.  Plaintiff states she

3  "went in and knocked on the unit [offender] Eddie [Brown] was housed in, 'cause he was

4  asleep."  Dkt. 27-12, at 51.  She opened the cuff port and handed offender Brown his three cards.

5  Dkt. 27-12, at 51.  They had a brief conversation and she left.  Dkt. 27-12, at 57.

6      CO Lowery returned from unsuccessfully trying to find a sergeant, and watched Plaintiff

7  in the SHU on a video camera.  Dkt. 27-5, at 28.  He testified that he thought it strange that she

8  opened the cuff port, when they typically slip the mail under the door.  Dkt. 27-5, at 29.  CO

9  Lowery testified that opening the cuff port can be unsafe if the officer is alone.  Dkt. 27-5, at 44.

10  This was Plaintiff's third or fourth time in the SHU.  Dkt. 27-12, at 51.

11      6.  <u>Reports and Investigation Regarding Plaintiff's Entering the SHU</u>

12      A few minutes after Plaintiff left, CO Lowery called the Olympic Unit and CO Brown

13  answered the phone.  Dkt. 27-5, at 32.  CO Lowery asked CO Brown if he had sent Plaintiff over

14  to the SHU with mail.  Dkt. 27-5, at 32.  CO Brown told CO Lowery "no."  Dkt. 27-9, at 5.  CO

15  Lowery states that, "he may have expressed some concern about cards that had been delivered to

16  the SHU," but otherwise the conversation was "very brief."  Dkt. 32, at 6.  CO Brown told CO

17  Lowery that if he had concerns, he should let his supervisor know about them.  Dkt. 35, at 4.

18      CO Lowery reported the incident to Sergeant Donald Holevinski when the sergeant

19  returned, about 15-20 minutes later.  Dkt. 27-5, at 30.  Sergeant Holevinski passed the incident

20  up his chain of command to Lt. Headley.  Dkt. 27-6, at 6.  He states he felt that offender Brown

21  was a "very manipulative inmate."  Dkt. 33, at 3.  Neither CO Lowery nor Sergeant Holevinski

22  knew of Plaintiff's family relationship with offender Brown.  Dkts. 32, at 3 and 33, at 3.  Lt.

23  Headley, aware of the family relationship between Plaintiff and offender Brown, ordered the

24

offender Brown's cell be searched. Dkt. 27-6, at 8. Lt. Headley testified that she felt that it was "unusual for someone to enter the SHU without authorization and especially to give an offender who's in segregation items." Dkt. 27-7, at 10. Lt. Headley indicated that she was concerned because Plaintiff entered an area she was not assigned to enter, did not have a supervisor directing her to do it, and had underrepresented her relationship with the offender to whom she gave the items. Dkt. 27-7, at 14.

The cell was searched, the three greeting cards were seized, but nothing else was found. Dkt. 27-6, at 8-9. There were no threats, drugs, or weapons of any kind in the cards. Dkt. 27-7, at 13.

Lt. Headley reported the incident up her chain of command to Captain David Flynn. Dkt. 27-7, at 11. She also drafted a report and sent it to Captain Flynn and Lt. Dolman. Dkt. 27-7, at 13. According to CO Brown, at Lt. Dolman's direction, he told Captain Flynn what he knew of the incident – that he had not sent Plaintiff over to the SHU with mail. Dkt. 43-5, at 3.

After hearing of Plaintiff's reported entry into the SHU on September 10, 2009, Superintendent Yoshida ordered Captain Flynn to conduct an investigation. Dkt. 38, at 4. On October 5, 2009, Captain Flynn gave Superintendent Yoshida his investigation report and they discussed his findings. Dkt. 38, at 4. Captain Flynn recommended that Plaintiff be terminated for: 1) failing to report the significance of her relationship with offender Brown, 2) failing to report that she had any relationship with offender Cash and contact with Annette Brown, 3) delivering cards to offender Brown that violated CCCC policy because they did not have postage, postmarks or addresses, 4) delivering mail to the SHU as an R & M officer, without direction from a supervisor and without signing the SHU log, and by doing so "created an opportunity for a discussion with offender Brown, with whom she had a family relationship,

1 while the offender was separated from the general population," 5) opening the cuff port when she

2 was not authorized to do so, and 6) having been already suspected of delivering drugs to this

3 same inmate. Dkt. 31, at 4-5.

4        Unaware of CO Brown's interactions with Plaintiff, Superintendent Yoshida stated that

5 she decided to terminate Plaintiff from her probationary position after considering input from

6 Captain Flynn, Mr. Washburn, and Sue Leoppard, CCCC's human resources person. Dkt. 27-11,

7 at 8. Superintendent Yoshida states that she was also considered Investigator Shumaker's input

8 from the investigation in July of 2009. Dkt. 27-11, at 8. Superintendent Yoshida stated that she

9 believed that Plaintiff "took cards from someone in the community and took them to Mr. Brown

10 in the secured housing unit." Dkt. 27-11, at 13-14. She states that she believed that Plaintiff

11 "did that deliberately and knowing that she was in violation" of DOC policy. Dkt. 27-11, at 14.

12 Plaintiff's employment as a probationary corrections officer was formally terminated on October

13 6, 2009. Dkt. 31-4, at 1-2.

14     **B. PLAINTIFF FILES DISCRIMINATION COMPLAINTS**

15        On October 12, 2009, Plaintiff filed her internal discrimination complaint with CCCC.

16 Dkt. 38-6, at 1-8. Her complaint was investigated, but the decision to fire her was not changed.

17 Dkt. 38, at 5-7.

18        After filing a complaint with the U.S. Equal Employment Opportunity Commission

19 ("EEOC"), and receiving her Notice of Right to Sue letter, she filed this case in Thurston County

20 Washington Superior Court. Dkt. 1.

21     **C. PROCEDURAL HISTORY OF THIS CASE**

22        The case was removed by Defendants to this Court on April 11, 2011. Dkt. 1. Plaintiff

23 asserts a federal claim against the DOC for sexual harassment in violation of Title VII of the

24

Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et. seq.* Dkt. 1. She also makes state law claims for sexual harassment against all Defendants pursuant to the Washington Law Against Discrimination ("WLAD"), RCW 49.60, *et. seq.* Dkt. 1. Plaintiff stipulated to dismissal, with prejudice, of her claim for termination in violation of public policy. Dkt. 13.

**D. PENDING MOTION FOR SUMMARY JUDGMENT**

Defendants now move for summary dismissal of Plaintiff's federal sexual harassment claim under Title VII and the same claim under WLAD, both made against the DOC, arguing that: 1) she failed to show that the harassment affected the terms or conditions of her employment and 2) failed to show that the harassment may be imputed to the DOC. Dkts. 26 and 46. They argue that the state law claim under WLAD should be dismissed because: 1) co-workers may not be held liable for acts of discrimination or harassment under WLAD, 2) a co-worker acting alone may not be held under a theory of aiding and abetting for acts of discrimination under the WLAD, 3) the individual Defendants' participation in an investigation relating to allegations of Plaintiff's misconduct do not amount to aiding or abetting discrimination or harassment, 4) and Plaintiff cannot show that the DOC separated her because of her sex. *Id.*

Plaintiff responds, arguing that her federal and state claim for sexual harassment should not be dismissed because CO Brown was her "defacto" supervisor. Dkt. 41. She argues that Superintendent Yoshida failed to properly investigate Lowery and Brown's motivation against Plaintiff. Dkt. 41.

**E. ORGANIZATION OF THE OPINION**

This opinion will first address the Defendants' motion to enlarge time and motion to strike, and then will address the motion to summarily dismiss Plaintiff's claim for hostile work environment under the federal statute, Title VII. Lastly, the opinion will discuss the state law

1 claims and whether this Court should exercise jurisdiction over them.

2 II. **DISCUSSION**

3 **A. DEFENDANTS' MOTIONS TO ENLARGE TIME AND TO STRIKE**

4 Defendants' motion to enlarge time to file their reply one day late (Dkt. 44) should be

5 granted. Plaintiff filed her response (Dkt. 41) one day late, and so in the interests of fairness,

6 Defendants should be granted one additional day to file their reply. Both pleadings have been

7 considered.

8 Defendants' motion to strike (Dkt. 46) should be denied without prejudice. Defendants move

9 to strike various portions of the Declaration of Stephen Bean and the Declaration of Denise

10 Fraser. Dkt. 46. While many of the objections were well taken, they pertained to evidence that

11 was unnecessary, irrelevant, and if considered, only for limited purposes. Further, many of the

12 objections related to the state law claims. Those objections, in particular, should be denied

13 without prejudice.

14 **B. SUMMARY JUDGMENT STANDARD**

15 Summary judgment is proper only if the pleadings, the discovery and disclosure materials

16 on file, and any affidavits show that there is no genuine issue as to any material fact and that the

17 movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party is

18 entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient

19 showing on an essential element of a claim in the case on which the nonmoving party has the

20 burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue

21 of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find

22 for the non moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

23 (1986)(nonmoving party must present specific, significant probative evidence, not simply "some

24

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT- 15

1    metaphysical doubt."). *See also* Fed.R.Civ.P. 56(e). Conversely, a genuine dispute over a

2    material fact exists if there is sufficient evidence supporting the claimed factual dispute,

3    requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty*

4    *Lobby, Inc.*, 477 .S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors*

5    *Association*, 809 F.2d 626, 630 (9th Cir. 1987).

6            The determination of the existence of a material fact is often a close question. The court

7    must consider the substantive evidentiary burden that the nonmoving party must meet at trial –

8    e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254, *T.W. Elect.*

9    *Service Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor

10   of the nonmoving party only when the facts specifically attested by that party contradict facts

11   specifically attested by the moving party. The nonmoving party may not merely state that it will

12   discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial

13   to support the claim. *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*).

14   Conclusory, non specific statements in affidavits are not sufficient, and "missing facts" will not

15   be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

16           The Ninth Circuit has provided additional guidance when an employer brings a motion

17   for summary judgment in an employment discrimination case. Such motions must be carefully

18   examined in order to zealously guard an employee's right to a full trial, since discrimination

19   claims are frequently difficult to prove without a full airing of the evidence and an opportunity to

20   evaluate the credibility of the witnesses. *McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1112

21   (9th Cir. 2004). This high standard means that an employee need only produce "very little

22   evidence" to survive summary judgment in a discrimination case because the ultimate question is

23   one that can only be resolved through a "searching inquiry" – one that is most appropriately

24

conducted by the factfinder, upon a full record.  *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996) (*internal quotations omitted*).

### C.  FEDERAL HOSTILE WORK ENVIRONMENT CLAIM ASSERTED AGAINST DOC

Under Title VII, an employer may not discriminate against a person with respect to his " . . . terms, conditions, or privileges of employment" because of his "race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).

Under either Title VII, to prevail on a hostile workplace claim premised on sex, a plaintiff must show: (1) that she was subjected to verbal or physical conduct of a sexual nature; (2) that the conduct was unwelcome; and (3) that "the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment."  *Gregory v. Widnall*, 153 F.3d 1071, 1074 (9th Cir. 1998)(*citing Fuller v. City of Oakland,* 47 F.3d 1522, 1527 (9th Cir.1995)).

Even assuming, without finding, that Plaintiff makes *prima facie* case, Plaintiff's claim against the DOC for hostile work environment should be dismissed.  Plaintiff is unable to show that CO Brown's actions could be imputed to the DOC under Title VII.  Plaintiff argues that CO Brown was her supervisor, and even if he was not, DOC should have known of the harassment, and so is liable under Title VII.  Dkt. 41.

Under Title VII, "[w]hen harassment by a supervisor is at issue, an employer is vicariously liable, subject to a potential affirmative defense."  *Dawson v. Entek Intern.*, 630 F.3d 928, 940 (9th Cir. 2011).  If the "harasser is merely a coworker, the plaintiff must prove that the employer knew or should have known of the harassment but did not take adequate steps to address it."  *Id.*

1.  Liability for Supervisors

"An employer is vicariously liable for actions by a supervisor who has immediate (or successively higher) authority over the employee." *Dawson,* at 940 (*internal quotations omitted*). The first issue here, then, is whether CO Brown was Plaintiff's supervisor for purposes of a hostile environment claim. "This distinction is not dependent upon job titles or formal structures within the workplace, but rather upon whether a supervisor has the authority to demand obedience from an employee." *Dawson,* at 940.

Plaintiff has failed to show sufficient evidence that CO Brown was her supervisor. Plaintiff testified that her supervisor was Sgt. Killingsworth. Dkt. 48-2, at 2. CO Brown was a corrections officer, like Plaintiff. There is no evidence that he had the authority to "demand obedience" from her. He did not control her work assignments or her schedule. He did not have the authority to hire, fire, or take other employment action against her.

Plaintiff argues that even though CO Brown was not formally her supervisor, as a non-probationary corrections officer, he could have played a role in completion of her COACH training plan requirements, making him a "defacto" supervisor. Dkt. 41. It is undisputed that he did not, however, fill out any of her COACH forms. She worked with several other staff members to complete the COACH tasks.

Plaintiff states that he told her he would put in a "good word" for her. Dkt. 43-6, at 5. There is no evidence to whom he was going to relay this information. This sort of general statement is not sufficient to conclude that he was her supervisor or that he had influence with her supervisors. Plaintiff points out that it was "widely believed" that CO Brown had "unique influence" on Lt. Dolman. Dkt. 41. Even if true, which both Brown and Dolman deny, (Dkt. 34, at 5) Plaintiff fails to point to the relevance of this connection. She does not assert that Lt. Dolman was aware of any of CO Brown's sexually motivated actions, or that CO Brown in any

1  manner threatened to attempt to sway Lt. Dolman if she did not comply with his desire to have a

2  relationship.  Other than be her putative supervisor after she was sent home during the

3  investigation of the SHU incident, Lt. Dolman did not play a role in her separation from her

4  employment.  He did not conduct the investigation, or contribute anything meaningful to it.

5      Even if CO Brown was her supervisor, Plaintiff failed to show that DOC should be held

6  liable for his conduct.  First, it is undisputed that CO Brown did not use his authority, if any, to

7  make employment decisions regarding Plaintiff.  His role in her termination was, at best, that of

8  a witness.  It is not disputed that after she left the SHU, CO Lowery called the Olympic Unit to

9  ask if they had sent her over with mail, and CO Brown said "no."  (She even acknowledges that

10  she did not tell CO Brown she was going to take the mail over.)  Plaintiff points out that CO

11  Brown "directed" CO Lowery to tell his supervisor about the incident.  However, it is undisputed

12  that these two men were peers, so CO Brown could not "direct" CO Lowery to do anything.

13  Further, reporting what he knew about an incident, and encouraging a peer to do the same, is not

14  sufficient to find that CO Brown exercised any supervisory authority or took an employment

15  action against Plaintiff.

16      In cases in which a supervisor engages in actions that constitute harassment of an

17  employee, but does not take a "tangible employment action," the employer is allowed "to assert

18  an affirmative defense-the employer may not be held vicariously liable if it is able to establish

19  that it acted reasonably and that its injured employee acted unreasonably."  *Holly D. v.*

20  *California Institute of Technology,* 339 F.3d 1158, 1166-1167 (9th Cir. 2003).

21      Plaintiff acknowledges that during her CORE training, she received a copy of DOC's

22  sexual harassment policies and received training regarding sexual harassment.  Dkt. 27-12, at 5-

23  9.  She knew that it was "just not tolerated" and that as a victim of sexual harassment she could

24

report it "up the chain of command." Dkt. 27-12, at 8-9. Plaintiff acknowledged that she did not complain of CO Brown's conduct to any person of "authority" while she worked at CCCC. Dkt. 27-12, at 39. Her complaints were filed after she was formally discharged.

Plaintiff has failed to show that DOC should be held liable as a supervisor. First, Plaintiff has failed to point to sufficient facts in dispute that would show that CO Brown was her supervisor. Second, even if he was her supervisor, he did not take tangible employment action against her as her supervisor. Third, even if he was her supervisor and he took no tangible employment action against her, she still failed to show that DOC acted unreasonably and she acted reasonably – she only reported his behavior after she was fired. To the extent that she alleges that the DOC should be held liable for CO Brown's actions as a supervisor, her claims against it should be dismissed. Plaintiff also argues, however, that the DOC should be held liable if CO Brown was just her co-worker. Dkt. 41.

2. Liability for Coworkers

To be held liable for harassment by a coworker, a plaintiff must prove that "the employer knew or should have known of the harassment but did not take adequate steps to address it." *Dawson,* at 940.

There is no evidence that the DOC knew of CO Brown's conduct toward Plaintiff. Plaintiff does not dispute that she failed to report CO Brown's actions to any of her supervisors or any person of authority during her employment at CCCC. Dkt. 27-12, at 39.

Plaintiff fails to show that the DOC should have known of CO Brown's actions. In her Response, she argues that Superintendent Yoshida failed to investigate Lowery and Brown's "motivation against a woman who spurned Brown's advances," even after learning that Brown instructed Lowery to report her for delivering mail that did not conform with DOC policy to an

offender in the SHU.  Dkt. 41.  To the extent that Plaintiff intends this argument to demonstrate that the DOC should have known of CO Brown's actions toward her, it is insufficient.  There is nothing in those actions alone – reporting, or encouraging the reporting, of a coworker for a perceived violation of security rules in a prison; that would notify the DOC that one of those reporters was acting inappropriately.  Further, this is particularly true when Plaintiff acknowledged that she did enter the SHU that day and give mail to an inmate with whom she had a family connection.

### 3.  Conclusion

Defendants' motion for summary dismissal of Plaintiff's hostile work environment claim, asserted against the DOC pursuant to Title VII, should be granted.  Plaintiff's federal hostile work environment claim should be dismissed.

## D.  STATE LAW CLAIMS ASSERTED AGAINST ALL DEFENDANTS

Pursuant to 28 U.S.C. § 1367(c), district courts may decline to exercise supplemental jurisdiction over a state law claims if (1) the claims raise novel or complex issues of state law, (2) the state claims substantially predominate over the claim which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.  "While discretion to decline to exercise supplemental jurisdiction over state law claims is triggered by the presence of one of the conditions in § 1367(c), it is informed by the values of economy, convenience, fairness, and comity." *Acri v. Varian Associates, Inc*., 114 F.3d 999, 1001 (9th Cir. 1997)(*internal citations omitted*).

Here, two of the four conditions in § 1367(c) are present.  As above, all Plaintiff's federal claims are dismissed by this order.  Accordingly, this Court has "dismissed all claims over which

it has original jurisdiction," and so has discretion to decline to exercise supplemental jurisdiction over the state law claims under § 1367(c)(3).  Moreover, the remaining state claims "raise novel or complex issues of state law" under § 1367(c)(1).  For example, in order to determine whether Plaintiff's aiding and abetting discrimination claims, brought pursuant to WLAD, survive summary judgment, the undersigned would have to determine the proper level of intent required - a determination for which the state court is uniquely suited.  Because state courts have a strong interest in enforcing their own laws, *See Carnegie-Mellon University v. Cohill,* 484 U.S. 343, 352 (1988), the value of comity is served by this Court declining jurisdiction.  Further, the values of economy, convenience, and fairness may well be served by this Court's declining to exercise supplemental jurisdiction.  *See Acri* at 1001.

Although "it is generally within a district court's discretion either to retain jurisdiction to adjudicate the pendent state claims or to remand them to state court," *Harrell v. 20th Ins. Co.,* 934 F.2d 203, 205 (9th Cir. 1991) in the interest of fairness, the parties should be given an opportunity to be heard on whether the case should be remanded.  Parties should be ordered to show cause, if any they have, why the remaining state law claims should not be remanded to Thurston County Superior Court.  Parties' briefs, if any, should be due March 16, 2012.  Parties' briefs should not exceed three pages.  Consideration of the parties' responses to the Order to Show Cause should be noted for March 16, 2012.  In the meantime, the remaining issues in Defendants' Motion for Summary Judgment (Dkt. 41), which are based entirely on state law, should be stricken, but may be renoted if the Court ultimately decides to exercise supplemental jurisdiction.

**III.    ORDER**

Therefore, it is hereby **ORDERED** that

- Motion to Enlarge Time to File Defendants' Summary Judgment Reply (Dkt. 44) **IS GRANTED**;

- Defendants' motion to strike (Dkt. 46) **IS DENIED WITHOUT PREJUDICE**;

- Defendants' Motion for Summary Judgment (Dkt. 26) **IS GRANTED** as to Plaintiff's federal claim for hostile work environment, and **STRICKEN** as to the remaining state law claims;

- Parties are **ordered to show cause**, if any they have, why the remaining state law claims should not be remanded to Thurston County Superior Court.  Parties' briefs, if any, are due **March 16, 2012** and are not to exceed three pages; and

- Consideration of the parties' responses to the Order to Show Cause is **noted** for **March 16, 2012**.

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing *pro se* at said party's last known address.        .

Dated this 6th day of March, 2012.

ROBERT J. BRYAN
United States District Judge